Mr. Justice HUNT,
concurring.
I cannot assent to' the proposition that the agents of the city appointed by the conquering power which captured it had authority to execute a Rase of its levees and wharves continuing more than nine years after the conquering power had abdicated its conquest. If an extension of nine years may be justified, it would.be difficult to repudiate an extension for ninety years, if that case should be presented. The Rase under consideration was executed on the 8th day of July, 1865, to Continue for the term of ten years. On the 18th of March,-1866, eight months and ten days after-wards, the military authority of the United States was withdrawn and the civil authority resumed its “sway. -The Rase continued for that length of time during the military occupation of .the city, and By its terms was to continue nine years., three 'months, and twenty days after the military dominion did in fact cease to exist. That the execution of this Rase was an--unwarranted assumption of power by the agents who made it, I quote Halleck on International Law and the Laws of War.* He uses this language :
“§4. Political laws, as. a general rule, are suspended during the military occupation of a conquered territory. The political connection between the peofile of such territory and the state to which they belong is not entirely severed, but is interrupted "or suspended so long as the occupation continues. -Their lands and immovable property are, there *397 fore,-not subject to the taxes, rents, &c., usually paid to the former sovereign. Those, as we have said elsewhere, belong of right to the conqueror, and he may demand and receive their payment to himself. They are a part of the spoils of war, and the people of the captured province or town can no more pay them to the former government than they can contribute funds or military munitions to assist, that government to prosecute the war. To do so would be a breach of the implied conditions under which the people of a conquered territory are allowed to enjoy their private property and to pursue their ordinary occupations, and would render the offender liable to punishment. They are subject to the laws of the conqueror, and not to the orders of the displaced government. Of lands and immovable property belonging to the conqucrod'state, the conqueror has, by the rights of-war, acquired the use so long as he holds them. The fruits, rents, and profits are, therefore, his; and he may lawfully claim and receive them. Any contracts or agreements, however, which he may make with individuals farming out such property, will continue only so long as he retains control of them, and will cease on their restoration to, or recovcry by, their former owner.” To which he cites Heffter;* Vattel;† American Insurance Co. v; Canter,‡ and other authorities. See also, Thirty Hogsheads of Sugar v. Boyle.§
The wharves and levees nowin question were land and immovable property belonging to the conquered state. The fruits and rents of them were spoils of war which belonged to the conqueror so long as he held the conquered state. When the possession of the conqueror was at an end, the rights belonging to a conqueror ceased also. The spoils of war do not belong to a state of peace.
It is said that although this.doctrine may be sound generally, it is not applicable to our recent civil war. But why not? The State of Louisiana was in rebellion against the United States government. It had formally disavowed its *398 association'with the United States, and had formally become a member of another and hostile confederated government. The United States invaded its territory and captured its commercial metropolis, not figuratively or metaphorically, but-literally and physically; with its ships, its cannon, and its men it battered down the forts built for its protection and drove out the armies by which it was defended. What it thus acquired by military power, it retained by the same .power.
.The armies of the revolting States were overthrown, and peace- ensued. It was not, as the ancient historian said, “ solitudinepi faciuni, pacem appellant,” but rest-, repose, and rights restored.. The State of Louisiana was again the sovereign authority in which all the administrative power of the State was vested. The city of New Orleans as a representative of the State, and under its authority, possessed the absolute control of its municipal powers, in the same manner '.an'd'to the same extent as it-possessed and exercised them before the existence'of the war. -The displaced government resumed its sway. The conqueror’s possession ceased.
-.The' State, of Louisiana and the Confederate government were public enemies, not unsuccessful revolutionists merely. The, forts of the Confederate States were blockaded as those . of a foreign enemy, and vessels taken .in attempting to enter ■them -were adjudged prizes of war. A prize court is in its very nature an international tribunal. Their captured soldiers were not shot as rebels, but were exchanged as prisoners of war. All intercourse between the citizens of the ; contending States was iílegal, contracts were dissolved or .suspended,- their property within our States was confiscated •to the public u.se. ' Iú short, we were at war with,.them. It is difficult to understand why the postliminy doctrine is not applicable under such circumstances.
In Fleming v. Page,* Chief Justice Taney says: “ The port of Tampico, at which the goods were shipped, and the Mexican State of Tamaulipas, in which it is situated, .were un *399 donbtedly, at the time of the shipment, subject to the sov-. ereignty and dominion of the United States. The Mexicán authorities had been driven' out or had submitted to our army and navy; and the country was in the exclusive and' firm possession of the United States, and governed by its military authorities, acting under the order of the President. But it does not follow that it was a part of the United States, or that it ceased to be a foreign country in the sense in which these words are used in the acts of Congress. .... .■ While it was occupied by our tro.ops, they were in an enemy’s country and not in their own; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than the submission and obedience, sometimes called temporary allegiance, which is due from a conquered enemy when he surrenders to a force which he is unable to resist, Tampico, therefore (he says), was a foreign port when this shipment was made.”
This ease is authority to the proposition that conquest and temporary military possession do not alter the national character of a city or port. As Tampico remained Mexican, notwithstanding its conquest' by pur armies, so New Orleans,, so far as the jus post limited is concerned, remained a part of the 'Southern Confederacy.
There is, howeyer, another .view of the case.that may be taken.
The care, custody, and control of wharves and levees is legitimately within the power of the city. Like streets and highways, they may be opened or closed in the discretion of the city. The mode 'in which they shall be used, how managed and regulated, whether open to the use of all indifferently, whether portions shall be set apart for particular uses, whether certain classes of business shall be confined to particular localities, whether controlled by the immediate agents of the city or managed by those to whom the city may lease them, are matters of police regulation to be settled by the authorities of the city;* In none of the cases is it to *400 be assumed th.at the power will be wilfully exercised to the injury of the city.
Iri my view, the agents of the city who made the lease of July 18th, 1865, which we are now considering, exceeded ,the authority-they possessed. Their authority was limited to the time of the possession' and control of the lots by the military authority which appointed them. The making of the lease, however, was not an illegal act in any other sense .than that the agents had exceeded their powers. The excessive acts of those agents were capable of ratification, and if ratified, were as binding upon the principal as if originally authorized
It appears that the lessees gave their notes (one hundred and twenty notes in number) for $666.66 each, payable monthly, for the whole amount of the rent to become due.' The first nine of the notes were paid to the mayor and bureau- acting under the military authority. The government of the city now in power was elected by the citizens according to law, in the ordinary manner, upon the resumption by the State and city of their ci.vil powers, and was vested with the entire authority of the city in respect to wharves, levees., their management and control. Upon the principles already stated, it had power to lease the levee and whajf in question to the steamship company for the period named In'the lease. Prior to the war, it had leased portions of-its wharves t& individuals, and had farmed out the collection of the levee dues upon the entire wharves by sections.*
•It came .into possession of the city government upon the election of its citizens on the 18th of March, 1866. Twenty-four days'.thereafter, to. wit, on the 11th of April, 1866, the' note for $666.66 due'three days previously, was paid to the city government. At the same time all the other notes, one hundred and eleven in number, were transferred by the military government to the nevv city administration. These notes were retained by the city,until several months after the presént .action was begun,-when they were tend J to *401 the plaintiff by supplemental answer. No tender was ever made Qf the money, $666.66, received by the city upon the note paid to it by the plaintiff for the rent due April 8th, 1866. It now holds and enjoys, to that amount, the rent received by it under a lease which it seeks to repudiate.
The reception and holding of this rent is a clear and unqualified act of ratification, which bars-the defence'of a want of authority to execute the lease from which it issued. It is in violation of every principle of honesty and of sound morality, that one should retain the benefit of the act of his agent, and at the same time repudiate such act.*
A ratification once made, with a knowledge of all the material circumstances, cannot be recalled.† A ratification of a part of a contract ratifies the whole.‡ One act of ratification is as complete and perfect in its effect as any number of acts of the same character.
For these reasons I am able to
Concur in the aeeirmance of the judgment.

 Page 780, § 4.

 Droit International, §§ 131-133, 186.

 Droit des Gens, liv. 3, ch. 13, § 197, et seq.

 1 Peters, 542.

 9 Cranch, 191.

 9 Howard, 614, &c.

 Slaughter-House Cases, 16 Wallace, 36.

 1 Dillon on Municipal Corporations, §§ 43, 64, 67, 74, 181.

 Story on Agency, §§ 239, 240, 252-3-4-9; Bissell v. Michigan Southern and Northern Indiana Railroad Company; 22 New York, 258; Parrish v. Wheeler, Ib. 504; Perkins v. Washington Insurance Co., 4 Cowen, 645; Peterson v. Mayor, 17 New York, 449.

 Story on Agency, § 242.

 Ib. and § 250.